UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HUSH LITTLE BABY, LLC,

Plaintiff,

v.                                                      CASE NO.  8:13-CV-2027-T-17AEP

CHERI CHAPMAN, et al.,

Defendants.

_____/

ORDER

This cause is before the Court on:

Dkt. 29    Plaintiff's Renewed Motion for Default Judgment For
           Unliquidated Damages Against Defendant Cheri Chapman
           And To Show Cause
Dkt. 16-4  Affidavit of Plaintiff Hush Little Baby, LLC in Support of
           Motion for Default Judgment for Unliquidated Damages Against
           Defendant Cheri Chapman

The basis of jurisdiction is diversity.  The Amended Complaint (Dkt. 23) includes
the following:

Count I     Breach of Fiduciary Duty (Under Maryland Law)
Count II    Tortious Interference With Economic Relations (Under Florida Law)
Count III   Extortion (Under Florida Law)
Count IV    Defamation (Under Maryland Law)
Count V     Unfair Trade Practices (Under Maryland Law and New York Law)
Count VI    Theft of Property (Under Maryland Law)

The factual basis of Count I includes Defendant Chapman's actions in deleting
client emails, contracts, other business documents, and stealing clients frm Plaintiff.  As

Case No. 8:13-CV-2027-T-17AEP

to Count I, Plaintiff Hush Little Baby, LLC alleges that, as a direct and proximate result
of Defendant Chapman's breach of fiduciary duty, Plaintiff has suffered losses in an
amount to be determined, but in excess of $100,000. Plaintiff further alleges that,
because the breach was malicious, and not done in good faith, Defendant Chapman is
also liable to Plaintiff for Plaintiff's reasonable attorney's fees and punitive damages in
an amount sufficient to deter such activities.

The factual basis of Count II includes Defendant Chapman's actions in stealing
proprietary information, calling [Plaintiff's] referral services, and stealing clients from
Plaintiff (Dkt. 23, p. 6). Plaintiff makes the same allegations of direct and proximate
result, losses in an undetermined amount, but in excess of $100,000.00, malicious
intent, liability for reasonable attorney's fees and for punitive damages in an amount
sufficient to deter such activities as to Count II, Tortious Interference With Economic
Relations.

The factual basis for Count III includes Defendant Chapman's actions in
threatening Plaintiff with legal action if Plaintiff did not pay Defendant Chapman her
money. As to Count III, Extortion, Plaintiff alleges direct and proximate result, losses in
an undetermined amount, but in excess of $25,000.00, malicious intent, liability for
reasonable attorney's fees, and punitive damages in an amount sufficient to deter such
activities in the future.

The factual basis for Count IV includes Defendant Chapman's actions in
maligning Plaintiff with clients, referral agencies and business associates. As to Count
IV, Defamation, Plaintiff alleges direct and proximate result, losses in an undetermined
amount, but in excess of $25,000.00, malicious intent, liability for reasonable attorney's
fees and punitive damages in amount sufficient to deter such activities in the future.

2

Case No. 8:13-CV-2027-T-17AEP

The factual basis for Count V includes Defendant Chapman's actions in stealing clients from Plaintiff, as well as stealing confidential document language. As to Count V, Unfair Trade Practices, Plaintiff alleges direct and proximate result, losses in an undetermined amount, but in excess of $250,000.00, malicious intent, liability for reasonable attorney's fees and punitive damages in an amount sufficient to deter such activities in the future.

The factual basis of Count VI includes Defendant Chapman's actions in stealing Defendant's proprietary documents. As to Count VI, Theft of Property, Plaintiff alleges direct and proximate result, losses in an undetermined amount, but in excess of $25,000,00, malicious intent, liability for reasonable attorney's fees, and punitive damages in an amount sufficient to deter such activities in the future.

I. Background

Plaintiff Hush Little Baby, LLC ("HLB"), a company which provides families with certified caregivers for newborns,  seeks default judgment against Defendant Cheri Chapman.   The actions on which this case is based span from September 6, 2012 through on or about June 28, 2013.   Plaintiff HLB filed suit on August 5, 2013.

Defendant Cheri Chapman joined Plaintiff HLB on September 6, 2012 as a caregiver, and on November 1, 2012, agreed to manage regional operations of Plaintiff HLB in the northeast for 50% of all regional profits. However, Defendant Chapman, while she was still working for Plaintiff HLB, started and began working for her own company, which was a competitor of Plaintiff HLB, and which offered services identical to those offered by Plaintiff HLB. Plaintiff HLB alleges that Defendant Chapman:  1) intentionally misappropriated specific business opportunities (contracts with parents of newborns who were seeking a certified caregiver); 2)  used Plaintiff HLB's contracts and forms to misappropriate the specific business opportunities; 3)  misappropriated

3

Case No. 8:13-CV-2027-T-17AEP

referrals from families Plaintiff HLB was already serving; 4) deleted thousands of emails and other files from Plaintiff HLB's Google Drive, which contained client information, client leads and historical business data; 5) after termination from Plaintiff HLB, Defendant Chapman contacted Jessica Brodey, President of Eat Sleep Love, a business partner and source of referrals to Plaintiff HLB, in an attempt to interfere with Plaintiff HLB's business; 6) is believed to have contacted Florida-based caregivers and made false statements about Plaintiff HLB that are injurious to Plaintiff; and 7) after termination from Plaintiff HLB, Defendant Chapman continued to harass and threaten Plaintiff HLB, through statements to Haleigh Almquist, in order to extort payments to which Defendant Chapman was not entitled, as follows:

> "This week, my counsel will contact other companies that you have or are doing business with and let them know you are being sued for nonpayment and illegal employment practices. They are looking for witnesses to state that I was employed by you and worked on your behalf. I also gave them the contact numbers and addresses for future and past clients in the event they want to collect depositions stating I exclusively worked with them and secured contracts for business......I am going to apologize in advance what this will look like for your future ability to get or sustain business. It is looking grim.

(Dkt. 23, p. 5).

"Google Drive" is a file storage and synchronization service created by Google. It allows users to store files in the cloud, share files, and edit documents, spreadsheets and presentations with collaborators. Google Drive incorporates a system of file sharing in which the creator of a file or folder is, by default, its owner. The owner has the ability to regulate the public visibility of the file or folder. Ownership is transferable. Files or folders can be shared privately with particular users having a Google account, using their @gmail.com email addresses. Files can be shared with users not having a Google account by making them accessible to "anybody with the link"; a secret URL is generated for the file, which can be shared via email, etc. See Google Drive, https://en.wikipedia.org/w/index.php?title=Google_Drive&oldid=688851560 (last visited

Case No. 8:13-CV-2027-T-17AEP

Nov 19, 2015).

II. Standard of Review

When a party against whom a judgment for affirmative relief is sought fails to plead or otherwise defend as provided by the Federal Rules of Civil Procedure, and that fact is made to appear by affidavit or otherwise, the Clerk enters default. Fed. R. Civ. P. 55(A). However, the mere entry of default by the Clerk does not in itself warrant the entry of default judgment by the Court. Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975). Rather, the Court must find that there is a sufficient basis in the pleadings for the judgment to be entered; Id.; see Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1370 n. 41 (11th Cir. 197). ("[A] default judgment cannot stand on a complaint that fails to state a claim."). A default judgment has the effect of establishing as fact the plaintiff's well-pled allegations of fact, and bars the defendant from contesting those facts on appeal. See Buchanan v. Bowman, 820 F.3d 359, 361 (11th Cir. 1987)(citing Nishimatsu, 515 F.2d at 1206). Although it must accept well-pled facts as true, the Court is not required to accept a plaintiff's legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Notwithstanding the propriety of default judgment against a defendant, it remains incumbent on the plaintiff to prove the amount of damages to which he or she is entitled. "While well-pleaded facts in the complaint are deemed admitted, a plaintiff's allegations relating to the amount of damages are not admitted by virtue of default; rather, the court must determine both the amount and character of damages." Whole Space Indus., Ltd. v. Gulfcoast Int'l Prods., Inc., 2009 WL 2151309 at *3 (M.D. Fla. July 13, 2009). Therefore, even in the default judgment context, "[a] court has an obligation to assure that there is a legitimate basis for any damage award it enters[.]" Anheuser Busch, Inc. v. Philpot, 317 F.3d 1264, 1266 (11th Cir. 2003); see Adolph Coors Co. v. Movement Against Rascism and the Klan, 777 F.2d 1538, 1544 (11th Cir.

Case No. 8:13-CV-2027-T-17AEP

1985)(explaining that damages may be awarded on default judgment only if the record adequately reflects a basis for an award of damages); Everyday Learning Corp. v. Larson, 242 F.3d 815, 818 (8th Cir. 2001)(affirming lower court's decision not to award damages on default judgment, where requested damages were speculative and not proven by a fair preponderance of the evidence).

The Eleventh Circuit has explained that "[f]ederal law...requires a judicial determination of damages absent a factual basis in the record," even where the defendant is in default. Anheuser Busch, 317 F.3d at 1266. Ordinarily, unless a plaintiff's claim against a defaulting defendant is for a liquidated sum or one capable of mathematical calculation, the law requires the district court to hold an evidentiary hearing to fix the amount of damages. See S.E.C. v. Smyth, 420 F.3d 1225, 1231 (11th Cir. 2005). However, no hearing is needed "when the district court already has a wealth of evidence from the party requesting a hearing, such that any additional evidence would be truly unnecessary to a fully informed determination of damages." See id. At 1232, n. 13; see also Wallace v. The Kiwi Group, Inc., 247 F.R.D. 679, 681 (M.D. Fla. 2008).

III. Analysis

A. Service and Clerk's Default

Plaintiff HLB filed the Amended Complaint (Dkt. 23) on April 6, 2015. Plaintiff HLB obtained personal service on Defendant Cheri Chapman on May 9, 2015 (Dkt. 27). Defendant Cheri Chapman did not respond to the Amended Complaint. The Court previously denied Defendant Chapman's Motion to Quash Service of Summons and Motion for Dismissal with Prejudice as to service of the Complaint (Dkt. 20). A Clerk's Default was entered on July 6, 2015 (Dkt. 33).

Case No. 8:13-CV-2027-T-17AEP

B. Liability

Plaintiff HLB is seeking entry of a final default judgment. Plaintiff HLB chose the substantive law which applies in each count of the Amended Complaint. Aside from Count I, which involves the internal affairs doctrine, the Court will assume that Plaintiff HLB chose the substantive law of the state which has the most significant relationship to the claim asserted in each remaining count. Both Florida and Texas have adopted the "most significant relationship" test as to tort claims. See Bishop v. Florida Specialty Paint Co., 389 So.2d 999 (Fla. 1980); Duncan v. Cessna Aircraft Co., 665 S.W.2d 414 (Tex. 1984).

1. Count I - Breach of Fiduciary Duty (Maryland Law)

a. Preliminary Issue - Choice of Law

A federal court sitting in diversity, 28 U.S.C. Sec. 1332, applies the forum state's choice of law rules to determine which substantive law governs the action. United States Fid. & Guar. Co. v. Liberty Surplus Ins. Corp., 550 F.3d 1031, 1033 (11th Cir. 2008)(citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941)) . The Court must determine which state's substantive law the Florida Supreme Court would choose to govern Count I.

Plaintiff HLB alleges that Plaintiff HLB is a Florida limited company, which has, at all times relevant herein, maintained its principal place of business in Tampa, Florida. (Dkt. 23, p. 1). The Court takes judicial notice of the records of the Florida Division of Corporations, which indicate that Plaintiff HLB is a foreign limited liability company registered to do business in Florida. (Exh. 1). Plaintiff HLB was organized under the laws of the State of Texas.

Case No. 8:13-CV-2027-T-17AEP

1. Internal Affairs Doctrine

As codified in the Florida Statutes, the internal affairs doctrine applies to limited liability companies as well as corporations and other entities. Florida's choice-of-law provisions provide that the internal affairs of a foreign limited liability company are governed by the law of the state in which the company is organized. See Florida Statute 608.505 (2013):

> (1) A certificate of authority authorizes the foreign limited liability company to which it is issued to transact business in this state subject, however, to the right of the Department of State to suspend or revoke the certificate as provided in this chapter.
>
> (2) A foreign limited liability company with a valid certificate of authority has the same but no greater rights and privileges than a domestic limited liability company. Unless otherwise provided by this chapter, a foreign limited liability company is subject to the same duties, restrictions, penalties, and liabilities now or later imposed on, a domestic limited liability company of like character.
>
> (3) This chapter does not authorize this state to regulate the organization or internal affairs of a foreign limited liability company authorized to transact business in this state. The laws of the state or other jurisdiction under which a foreign limited liability company is organized govern the foreign limited liability company's organization, internal affairs, and the liability of its managers, members, and their transferees.

See also Aquent, LLC v. Stapleton, 65 F.Supp.3d 1339 (M.D. Fla. Jan. 13, 2014); Mukamal v. Bakes, 378 Fed. Appx. 890, 897 (11th Cir. 2010). The Court harbors some doubt as to whether Maryland law controls Count I, since Count I involves the internal affairs of the Plaintiff HLB.

8

Case No. 8:13-CV-2027-T-17AEP

Restatement (Second) of Conflict of Laws, Sec. 313, provides:

A court will exercise jurisdiction over an action involving the internal affairs of a foreign corporation unless it is an inappropriate or an inconvenient forum for the trial of the action.

COMMENTS & ILLUSTRATIONS:   Comment:

a.  Meaning of "internal affairs."  As used in the Restatement of this Subject, a corporation's internal affairs are involved whenever the issue concerns the relations inter se of the corporation, its shareholders, directors, officers or agents....

......

e.  Applicable law.  This Section has to do only with limitations upon the exercise of judicial jurisdiction; it does not involve the question of what law governs the various aspects of a corporation's activities and existence. Even when a court entertains a suit involving the internal affairs of a foreign corporation, it will, in accordance with the rules stated in this Chapter and in the absence of an applicable local statute, usually apply the local law of the state of incorporation in arriving at the ultimate decision of the case.

An exception to the internal affairs doctrine exists in the "unusual case" where the forum state has a more significant relationship to the parties and the occurrence. See Restatement (Second) of Conflict of Laws, Secs. 302, 306, 309 (applicable to corporations rather than LLCs).

In the jurisdictional allegations of the Amended Complaint, Plaintiff HLB alleges that Plaintiff is a Florida limited liability company which has, at all times relevant herein, maintained its principal place of business in Tampa, Florida.  Plaintiff HLB does not allege that  Florida has a more significant relationship to the parties and the occurrence than Texas, the jurisdiction under whose law Plaintiff HLB was formed.

Case No. 8:13-CV-2027-T-17AEP

Plaintiff HLB has included factual allegations of an employer/employee relationship between Plaintiff HLB and Defendant Chapman, as well as allegations of a management relationship between Plaintiff HLB and Defendant Chapman. Plaintiff HLB alleges that Defendant Chapman was employed by Plaintiff HLB from September 6, 2012 to June 23, 2013, and that Defendant Chapman agreed to manage HLB's regional operations in the northeast in exchange for 50% of all regional profits on November 1, 2012.

Plaintiff HLB further alleges that Corinne Freesemann and Defendant Chapman began speaking about sharing caregivers for a 5% referral fee on April 11, 2013; that Corinne Freesemann's company approached Defendant Chapman about working in New York City on May 8, 2013, and emailed Defendant Chapman about starting a business in New York on May 22, 2013. (Dkt. 23, p. 2). Plaintiff HLB alleges that: 1) Defendant Chapman, prior to her termination on June 23, 2013, sent a contract bearing the logo of Rensom, LLC, a competitor of Plaintiff HLB, to Plaintiff HLB's client, "Jane Doe"; 2) Defendant Chapman posted the contract, which contained confidential client information and the template for HLB contracts, in the public domain; 3) on June 24, 2013, Defendant Chapman admitted to Haleigh Almquist that Defendant Chapman deleted all emails from Plaintiff HLB's Google Drive; the emails and files contained client information, client leads, and historical business data; 4) that on June 24, 2013, Defendant Chapman admitted to Haleigh Almquist that Defendant Chapman shared an online client's application with Defendant Rensom, LLC, and admitted to working for Defendant Rensom; 5) that on June 28, 2013, Defendant Chapman messaged Brittany Hunt, a temporary newborn care specialist for Plaintiff HLB, that Defendant Chapman started a newborn care training company with another nurse; 6) that Defendant took the "Kate Doe" family, a referral of Plaintiff HLB, to Brittany Hunt; 7) Defendant Chapman took three additional family referrals, from the "Kate Doe" family, and used them for her business; and that 8) Defendant Chapman used her position with HLB to steal the "Jane Doe" contract valued at $28,000.00 from Plaintiff HLB, the "Kate Doe" family

10

Case No. 8:13-CV-2027-T-17AEP

referral, the referrals of the "Kate Doe" family and an unknown amount of other contracts for Defendant Chapman and the other Defendants.

The Court notes that Corinne Freesemann, Happy Baby Solutions and Rensom, LLC were named as Defendants in the Complaint (Dkt. 1), but were dismissed with prejudice on April 2, 2014, pursuant to Plaintiff HLB's Motion (Dkts. 14, 15).

b. Texas Law

In this case, the facts in the Amended Complaint are undisputed.  Where the underlying facts are undisputed, determination of the existence, and breach of fiduciary duties are questions of law, exclusively within the province of the court.  See National Medical Enterprises v. Godbey, 924 S.W.2d 123 (Tex. 1996).

To recover on a breach of fiduciary duty claim, the plaintiff must first show that the defendant owed a fiduciary duty.  Gregan v. Kelly, 355 S.W.3d 223, 227 (Tex. App. 1st Dist. 2011).    Not every employer/employee relationship is a fiduciary relationship. Plaintiff HLB's factual allegation that Defendant Chapman was the manager of a segment of Plaintiff HLB's business in a particular area, in exchange for a percentage of all regional profits, is sufficient for the Court to determine that Defendant Chapman had a fiduciary duty to Plaintiff HLB as to the matters within the scope of Defendant Chapman's agency.  The Court views the relationship as a formal fiduciary relationship arising as a matter of law between principal and agent.

When a fiduciary relationship of agency exists between employee and employer, the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency." Abetter Trucking Company v. Arizpe, 113 S.W.3d 503, 510 (Tex. App. 1st Dist. 2003)(citing  Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 200, 45 Tex. Sup. Ct. J. 470 (Tex. 2000).  "Among the agent's fiduciary duties to

11

Case No. 8:13-CV-2027-T-17AEP

his principal are the duty not to compete with the principal on his own account in matters relating to the subject matter of the agency and the duty to deal fairly with the principal in all transactions between them...The employee has a duty to deal openly with the employer and to fully disclose to the employer information about matters affecting the company's business...If an agent, while employed by his principal, uses his position to gain a business opportunity belonging to the employer, such conduct constitutes an actionable wrong.  Id.

In Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d at 201, the Court notes that "courts have been, and should be, careful in defining the scope of fiduciary obligations an employee owes when acting as the employer's agent in the pursuit of business opportunities."  The Johnson Court further notes:

> "The Bray decision was consistent with decisions in other jurisdictions which have held that an employee does not owe an absolute duty of loyalty to his or her employer.  As the Supreme Judicial Court of Massachusetts explained in Augat, Inc. v. Aegis, Inc....an employer's right to demand and receive loyalty must be tempered by society's legitimate interest in encouraging competition:
>
>> It is important to define the limited basis for liability we recognize in this case.  An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed...Such an employee has no general duty to disclose his plans to his employer, and generally he may secretly join other employees in the endeavor without violating any duty to his employer...The general policy considerations are that at-will employees should be allowed to change employers freely and competition should be encouraged....If an employer wishes to restrict the post-employment competitive activities of a key employee, it may seek that goal through a non-competition agreement...The plaintiffs did not do so in this case.

There are, however, certain limitations on the conduct of an employee

Case No. 8:13-CV-2027-T-17AEP

> who plans to compete with his employer.  He may not appropriate his
> employer's trade secrets....He may not solicit his employer's customers
> while still working for his employer...and he may not carry away certain
> information, such as lists of customers....Of course, such a person may
> not act for his future interests at the expense of his employer by using the
> employer's funds or employees for personal gain or by a course of
> conduct designed to hurt the employer...."

Johnson v. Brewer & Pritchard, P.C. at 201-202.


After consideration, the Court finds that Plaintiff HLB has stated a cause of
action for breach of fiduciary duty under Texas law.


c.  Maryland Law


The Court could avoid the choice-of-law decision if analysis of Plaintiff's claim in
Count I would lead to identical results under Texas law and under Maryland law.
However, in this case, the Court's analysis leads to different results.


Under Maryland law, a claim for breach of fiduciary duty exists only where the
breach is alleged as an element of the cause of action–not as a separate cause of
action itself.  See Kann v. Kann, 690 A.2d 509, 521 (Md. 1997)(holding no universal or
omnibus tort for breach of fiduciary duty by any and all fiduciaries).  In Kann v. Kann,
the Court of Appeals explained:

> This does not mean that there is no claim or cause of action
> available for breach of fiduciary duty.  Our holding means
> that identifying a breach of fiduciary duty will be the
> beginning of the analysis, and not its conclusion.  Counsel
> are required to identify the particular fiduciary relationship
> involved, identify how it was breached, consider the
> remedies available, and select those remedies appropriate
> to the client's problem.

13

Case No. 8:13-CV-2027-T-17AEP

Id.

In <u>Wasserman v. Kay</u>, 197 Md. App. 586, 630-632 (Md. Ct. Spec. App. 2011), the Court affirmed the trial court's dismissal of a claim for breach of fiduciary duty, explaining:

> <u>Kann</u> and its progeny do not obliterate the possibility of a separate cause of action for breach of fiduciary duty in an action seeking equitable relief.  In a claim for monetary damages at law, however, an alleged breach of fiduciary duty may give rise to a cause of action, but it does not, standing alone, constitute a cause of action.  Here, the allegations in the count are relevant to other causes of action alleged (e.g., fraud, tortious interference, breach of contract, and negligence), but they do not constitute a stand alone nonduplicative  cause of action.

While Defendant Chapman was an employee, and serving as a manager, Defendant Chapman had a fiduciary duty of loyalty to Plaintiff HLB which required that Defendant Chapman refrain from actively and directly competing with Plaintiff HLB and to continue to exert her best efforts on behalf of her employer.  <u>See</u> <u>BEP, Inc. v. Atkinson</u>, 174 F.Supp.2d 400 (D. Md. 2001).  A party may prepare or make arrangements to compete with the party's employer prior to leaving employment without breaching the duty of loyalty.  However, under Maryland law, preparation crosses the line to breach of fiduciary duty by the commission of some fraudulent, unfair or wrongful act, such as conspiring to bring about the mass resignation of key employees, or recruiting employees and customers prior to resignation from employment.

In Count I, Plaintiff HLB seeks the award of monetary damages.  Count I duplicates Plaintiff's claim for tortious interference in Count II and Plaintiff's claim for unfair trade practices in Count V.  Therefore, because there is no standalone nonduplicative claim for breach of fiduciary duty under Maryland law, Count I is due to

Case No. 8:13-CV-2027-T-17AEP

be dismissed with prejudice.

Because the Court's analysis leads to different results under Texas law and
Maryland law, the Court must make an educated guess as to the substantive law that
the Florida Supreme Court would apply.  Based on the statutory directive expressed in
Florida Statute 608.505 (2013), the Court concludes that the Florida Supreme Court
would apply Texas law rather than Maryland law.

The Court therefore grants Plaintiff HLB's Motion for Default Judgment as to
liability for Count I.

2.  Count II - Tortious Interference With Economic Relations (Florida Law)

The elements of tortious interference with a contract or business relationship are:
1) the existence of a business relationship, not necessarily evidenced by an
enforceable contract, under which the plaintiff has legal rights; 2) the defendant's
knowledge of the relationship; 3) an intentional and unjustified interference with the
relationship by the defendant; and (4) damage to the plaintiff as a result of the
interference.    See Tamiami Trail Tours v. Cotton, 463 So.2d 1126, 1127 (Fla. 1985).
For the interference to be unjustified, the interfering defendant must be a third party, a
stranger to the business relationship. See Abruzzo v. Haller, 603 So.2d 1338 (Fla. 1st
DCA 1992); O. E. Smith's Sons, Inc. v. George, 545 So.2d 298, 299 (Fla. 1st DCA
1989).

However, the "privilege to interfere" enjoyed by an officer or employee of a
contracting party is not absolute.  The privilege is destroyed where an employee acts
solely with ulterior purposes, without an honest belief that his actions would benefit the
employer, and the employee's conduct concerning the contract or business relationship
is not in the employer's best interest.    See O.E. Smith's Sons, 545 So.2d at 299;

15

Case No. 8:13-CV-2027-T-17AEP

Scussel v. Balter, 386 So.2d 1227 (Fla. 3d DCA 1980).   The privilege to interfere may
be eliminated when an act is undertaken out of pure malice or if improper methods
were used.   See KMS Rest. Corp. v. Wendy's Int'l, Inc., 361 F.3d 1321, 1327 (11th Cir.
2004).

        Malice may be shown indirectly "by proving a series of acts which, in their
context or in light of the totality of the circumstances, are inconsistent with the premise
of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of
conduct motivated by spite, ill-will or other bad motive." Slip-N-Slide Records, Inc. v.
TVT Records, LLC, 2007 WL 3232274 at *3 (S.D. Fla. Oct. 31, 2007).  In examining
what constitutes improper methods, Florida Courts have stated:   In those
circumstances in which there is a qualified privilege to interfere with a business
relationship, the privilege carries with it the obligation to employ means that are not
improper.  In other words, the privilege does not encompass the purposeful causing of
a breach of contract.  The justification for intentional interference depends upon a
balancing of the importance, social and private, of the objective advanced by the
interference against the importance of the interest interfered with, considering all
circumstances among which the methods and means used and the relation of the
parties are important.  See McCurdy v.  Collis, 508 So.2d 380, 384 (Fla. 1st DCA 1984).

        The Court also notes that a plaintiff may properly bring a cause of action alleging
tortious interference with present or prospective customers, but no cause of action
exists for tortious interference with a business's relationship to the community at large.
See Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812, 814 (Fla. 1994).   To
be actionable, the interference must be direct; conduct that has only indirect
consequences on the plaintiff will not support a claim of tortious interference.

        In the Amended Complaint, Plaintiff alleges that on April 29, 2013, Client "Jane
Doe" contacted Haleigh Almquist (President of Plaintiff HLB) about providing newborn

16

Case No. 8:13-CV-2027-T-17AEP

care. (Dkt. 23, p. 2). The "Jane Doe" contract was valued around $28,000.00. (Dkt. 23, p. 2). In June, 2013, "Rensom, LLC" was created. (Dkt. 23, pp. 2-3). On June 23, 2013, Defendant Chapman sent a contract to "Jane Doe" which included the "Modern Newborn Solutions" logo of Rensom, LLC. (Dkt. 23, p. 3). On June 23, 2013, Plaintiff HLB terminated Defendant Chapman. (Dkt. 23, p. 3). Plaintiff further alleges that Defendant Chapman used her position with Plaintiff to steal from Plaintiff HLB the "Jane Doe" contract valued at over $28,000.00, the "Kate Doe" family referral, three additional referrals of the "Kate Doe" family and an unknown amount of other contracts.

Plaintiff further alleges that: 1) Defendant Chapman copied Plaintiff HLB's contract to use for her own business efforts, and the template for HLB contracts and confidential client information was posted on a public domain; 2) Defendant Chapman deleted thousands of emails belonging to Plaintiff HLB in an effort to cover-up Defendant's illicit practices of coordinating client referrals for herself and other Defendants, and to maliciously sabotage Plaintiff HLB's base of clients and client referrals. (Dkt. 23, p. 4).

Plaintiff further alleges that: 1) Defendant Chapman emailed Jessica Brodey, President of Eat Sleep Love, a business partner and source of referrals for Haleigh Almquist, owner of Plaintiff HLB, in an attempt to interfere with Plaintiff HLB's business; and 2) Defendant Chapman, in her official capacity and in her personal capacity, upon information and belief, has been contacting Florida providers of care and made false statements about Plaintiff that are injurious against trade or profession (Dkt. 23, pp. 3-4).

The Court notes that, in the Supporting Affidavit, Plaintiff HLB alleges that:

11. Defendant Chapman conspired to tortiously interfere with Plaintiff HLB's economic relations and in fact did interfere with Plaintiff HLB's economic relations, under New York law.

17

Case No. 8:13-CV-2027-T-17AEP

Plaintiff's First Amended Complaint states that Count II is brought under Florida law; the Court assumes that Plaintiff intended to allege that Defendant Chapman interfered with Plaintiff HLB's economic relations under Florida law.

After consideration, the Court finds that Plaintiff HLB has stated a cause of action for tortious interference with a business relationship under Florida law in Count II, and grants Plaintiff's Motion for Default Judgment as to liability.

3.  Count III - Extortion (Florida Law)

The allegations of the Amended Complaint include allegations that Defendant Chapman will be contacting other companies with whom Plaintiff is doing business or has done business to let those companies know that Plaintiff HLB is being sued for nonpayment and illegal employment practices. (Dkt. 23, p. 5). The thrust of the allegations is that Defendant Chapman intended to jeopardize Plaintiff HLB's ability to continue doing business by spreading false information about Plaintiff HLB, in order to persuade Plaintiff HLB to pay Defendant Chapman an unspecified amount of money. Plaintiff alleged that Defendant Chapman's email was intended to extort money from Plaintiff HLB that Defendant Chapman was not legitimately owed. (Dkt. 23, p. 5).

Violation of the criminal extortion statute, Ch. 836.05, Florida Statutes, does not give rise to a civil cause of action for damages.  Bass v. Morgan, Lewis & Bockius, 516 So.2d 1011 (Fla. 3d DCA 1988).

After consideration, the Court dismisses Count III with prejudice.

4.  Count IV - Defamation (Maryland Law)

In Count IV, Plaintiff HLB alleges that Defendant Chapman's actions in maligning

18

Case No. 8:13-CV-2027-T-17AEP

Plaintiff with clients, referral agencies and business associates was tantamount to defamation.  As noted above, the allegations of the Amended Complaint include allegations that Defendant Chapman will be contacting other companies with whom Plaintiff is doing business or has done business to let those companies know that Plaintiff HLB is being sued for nonpayment and illegal employment practices (Dkt. 23, p. 5).  The thrust of the allegations is that Defendant Chapman intended to jeopardize Plaintiff HLB's ability to continue doing business by spreading false information about Plaintiff HLB.  Plaintiff also alleges Defendant Chapman, in her official capacity and in her personal capacity, upon information and belief, has been contacting Florida providers of care and made false statements about Plaintiff that are injurious against trade or profession, and Defendant's actions have damaged the relationship between Plaintiff HLB, its business partners, caregivers, and its customers  (Dkt. 23, p. 4).  Plaintiff further alleges that Defendant could have no good faith belief that Plaintiff HLB had underpaid her, and Defendant Chapman could have no good faith belief that Plaintiff was engaging in illegal employment practices.  (Dkt. 23, p. 5).

Under Maryland law, a defamation claim requires a plaintiff to show: "1) the defendant made a defamatory communication to a third person; 2) that statement was false; 3) that the defendant was at fault in communicating the statement; and 4) that the plaintiff suffered harm."  See Samuels v. Tschechtelin, 763 A.2d 209, 241-42 (Md. Ct. Spec. App. 2000).  Although fault is generally determined under a negligence standard, where a defendant "publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties, or where his declaration would be of interest to the public in general," a conditional privilege applies.  See Klingshirn v. Fid. & Guar. Life Ins. Co., 2013 WL 4506271, *4 (D. Md. Aug. 22, 2013); see also Bagwell v. Peninsula Regional Med. Ctr., 665 A.2d 297, 317 (Md. Ct. Spec. App. 1995).   Whether a conditional privilege exists is a question of law.  Id.

Case No. 8:13-CV-2027-T-17AEP

If the privilege applies, a plaintiff must show that the defendant acted with malice to overcome it. Bagwell, 665 A.2d at 318; Gohari v. Darvish, 767 A.2d 321, 328 (2001)(to overcome conditional privilege, plaintiff must show that 1) the publication [was] made with malice, that is, with knowledge of the falsity or reckless disregard for the truth; 2) the statement was not made in furtherance of the interest for which the privilege exists; 3) the statement is made to a third person other than the one whose hearing is reasonably believed to be necessary or useful to the protection of the interest; and 4) the statement includes defamatory matter not reasonably believed to be in line with the purpose for which the privilege was granted).

'[A] statement is defamatory per se when, if true, it would disqualify an individual or render him less fit properly to fulfill the duties incident to the special character assumed." Klingshirn v. Fid. & Guar. Life Ins. Co., 2013 WL 4506271 (D. Md. Aug. 22, 2013). "Whether an alleged defamatory statement is per se or per quod is a question of law for the court." Samuels v. Tschechtelin, 763 A.2d 209, 244 (2000). A statement which disparages the business reputation of a plaintiff is one of the categories traditionally considered to be defamation per se.

The Court understands Plaintiff to allege that Defendant Chapman made false statements to third parties in Florida and elsewhere that Plaintiff was being sued for nonpayment and illegal employment practices. The statements involved in this case appear to be defamatory per se. If a statement is defamatory per se, damages are presumed when a plaintiff can demonstrate actual malice. See Samuels, 763 A.2d at 245. Plaintiff's allegation that Defendant Chapman could have no good faith belief that Plaintiff underpaid her and was engaging in illegal employment practices suffices as a statement of Defendant's knowledge of the falsity of the statements. An averment of knowledge that the statement was false is a sufficient allegation of actual malice. Id, at 245-47.

Case No. 8:13-CV-2027-T-17AEP

Plaintiff has identified the maker of the defamatory statements and the content of the defamatory statements.  In order for the Court determine damages, at a minimum, Plaintiff HLB must also identify the date on which the defamatory statements were made, and the person to whom the defamatory statements were communicated.

After consideration, the Court finds that Plaintiff has stated a claim for defamation in Count IV.  The Court therefore grants Plaintiff's Motion for Default Judgment as to liability.

5. Count V - Unfair Trade Practices (Maryland Law and New York Law)

The factual basis for Count V includes the allegations of Defendant Chapman's actions in stealing clients from Plaintiff HLB, and in stealing confidential document language.

In the Amended Complaint, Plaintiff alleges that Corinne Freesemann, through her company Happy Baby Solutions, LLC, approached Defendant Chapman about working in New York City in May, 2013.  (Dkt. 23, p. 2).  On April 29, 2013, Client "Jane Doe" contacted Haleigh Almquist (President of Plaintiff HLB) about providing newborn care.  (Dkt. 23, p. 2).  Corinne Freeseman referred a caregiver, Dottie Haynie, to Plaintiff HLB to work the "Jane Doe" contract.  (Dkt. 23, p. 2).  The "Jane Doe" contract was valued around $28,000.00.  (Dkt. 23, p. 2).  In June, 2013, "Rensom, LLC" was created.  (Dkt. 23, pp. 2-3).  On June 23, 2013, Defendant Chapman sent a contract to "Jane Doe" which included the "Modern Newborn Solutions" logo of Rensom, LLC.  (Dkt. 23, p. 3).  On June 23, 2013, Plaintiff HLB terminated Defendant Chapman.  (Dkt. 23, p. 3).  On June 28, 2013, Defendant Chapman sent a text message to a newborn care specialist for Plaintiff HLB, Brittany Hunt, that she had started a newborn care training company with another nurse.  (Dkt. 23, p. 4).    Plaintiff further alleges that Defendant Chapman used her position with Plaintiff to steal from Plaintiff HLB the "Jane

Case No. 8:13-CV-2027-T-17AEP

Doe" contract valued at over $28,000.00, the "Kate Doe" family referral, three additional referrals of the "Kate Doe" family and an unknown amount of other contracts, for Defendant Chapman. (Dkt. 23, p. 4).

Plaintiff further alleges that  Defendant Chapman copied Plaintiff HLB's contract to use for her own business efforts, and the template for HLB contracts and confidential client information was posted on a public domain. (Dkt. 23, p. 4).

In the Amended Complaint, Plaintiff HLB further alleges that Defendant Chapman notified Plaintiff HLB that Defendant Chapman will be contacting other companies with whom Plaintiff is doing business or has done business to let those companies know that Plaintiff HLB is being sued for nonpayment and illegal employment practices. (Dkt. 23, p. 5).   Plaintiff further alleges that Defendant Chapman could have no good faith belief that Plaintiff underpaid her and was engaging in illegal employment practices.

a.  Maryland Consumer Protection Act

The Maryland Consumer Protection Act, Maryland Commercial Law Code Ann., § 13-103, provides:

§ 13-103. Legislative intent; local provisions; enforcement

(a) Intent. -- This title is intended to provide minimum standards for the protection of consumers in the State.

See also § 13-102(b).

The Maryland Consumer Protection Act ("MCPA"), § 13-408, "Action for damages," provides in part:

Case No. 8:13-CV-2027-T-17AEP

>(a) Actions authorized.—In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.

>(b) Attorney's fees.–Any person who brings an action to recovery for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.

MCPA § 13-303, "Practices generally prohibited," states that "[a] person may not engage in any unfair or deceptive trade practice..." MCPA § 13-301 provides a nonexclusive list "defining" unfair or deceptive trade practices. In addition, "[i]t is the intent of the General Assembly that in construing the term 'unfair or deceptive trade practices,' due consideration and weight be given to the interpretation of Sec. 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts." MCPA § 13-105.

>The Court notes that MCPA § 13-301 provides:
>Unfair or deceptive trade practices include any:

>(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

>......

>(3) Failure to state a material fact if the failure deceives or tends to deceive;

>(4) Disparagement of the goods, realty, services, or business of another by a false or misleading representation of a material fact; ...

MCPA § 13-303, coupled with §§ 13-301 and 13-305, prohibit the communication to Maryland residents of false or misleading statements and inducements. If such statements are sent to Maryland residents, offensive conduct has occurred within

Case No. 8:13-CV-2027-T-17AEP

Maryland's borders, even if the communication originated in another state. To the extent that the communication is false or misleading on its face or becomes so by virtue of conduct occurring within Maryland, it is subject to the MCPA.

In this case, Plaintiff HLB alleges that Defendant Chapman is domiciled in Maryland, and is a citizen of Maryland. Plaintiff HLB further alleges that Plaintiff HLB, whose principal place of business is in Tampa, Florida, provides services to families in Texas, Florida, Virginia, Maryland and the District of Columbia.

Plaintiff HLB's claims under the MCPA are based in part on the fact that Defendant Chapman appropriated the "Jane Doe" contract, the "Kate Doe" referral, and three additional referrals from the "Kate Doe" family for Defendant Chapman's business. The Court understands Plaintiff's claim to be that Defendant Chapman misled these clients by appropriating each business transaction to Defendant Chapman's business, when the families intended to obtain services from Plaintiff HLB. If these families are residents of Maryland, the MCPA applies; if there are other unspecified clients who are residents of Maryland, the MCPA applies to those claims. However, if the clients to whom Defendant Chapman made representations to obtain their business are not residents of Maryland, the MCPA does not apply.

The Court further notes that causes of action under the MCPA are limited to "consumers" purchasing "consumer" goods or services.   See Boatel Indus. v. Hester, 77 Md. App. 284, 303, 550 A.2d 389 (1988); see also Penn-Plax, Inc. v. L. Schultz, Inc., 988 F.Supp. 906, 909-11 (D.Md.1997) (canvassing Maryland cases, observing that three federal courts, in reliance on those cases, have held that only consumers have standing under the CPA, and finally asserting that "there is no competitor standing under the CPA"). The CPA defines "consumers" as purchasers or recipients of "consumer" goods or services, "which are primarily for personal, household, family, or agricultural purposes." See Md. Code Ann., Comm. Law II § 13-101(c), (d); see also

Case No. 8:13-CV-2027-T-17AEP

<u>Fare Deals, Ltd. v. World Choice Travel Com., Inc.</u>, 180 F.Supp.2d 678, 692 (D. Md. 2001) (holding a "corporate commercial entity" is not a consumer under this Act).   <u>See</u>

After consideration, the Court denies the Motion for Default Judgment as to this issue, because Plaintiff HLB is not a consumer pursuant to the MCPA.

b.  New York General Business Law § 349

The Court assumes that Plaintiff HLB included a claim for unfair and deceptive trade practices pursuant to § 349 because some of the alleged wrongful conduct originated in New York.

§ 349 reads in relevant part:

 (a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

. . .

(g) This section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state, and shall not supersede, amend or repeal any other law of this state under which the attorney general is authorized to take any action or conduct any inquiry.

(h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

Case No. 8:13-CV-2027-T-17AEP

New York's General Business Law § 349 was designed as a broad, remedial statute to relax traditional barriers to common law fraud.  See Gaidon v. Guardian Life Ins. Co. of Am., 94 N.Y.2d 330, 343 (1999) ("In contrast to common-law fraud, General Business Law § 349 is a creature of statute based on broad consumer- protection concerns").  The legislature created the private action to augment the New York Attorney General's powers in enforcing consumer protection laws and to ensure trust and transparency in the marketplace. Id. at 343-44.  Businesses indirectly injured by deceptive conduct as well as consumers are afforded this statutory private right in New York.

A plaintiff under General Business Law § 349 must prove three elements:   1)  that the challenged act or practice was consumer-oriented;   2)  that it was misleading in a material way; and 3)  that the plaintiff suffered injury as a result of the deceptive act.  See Stutman v. Chemical Bank, 95 N.Y.2d 24, 29 (N.Y. 2000).   The standard for whether an act or practice is misleading is objective, requiring a showing that a reasonable consumer would have been misled by the defendant's conduct.  See Marcus v. AT&T, 138 F.3d 46, 64 (2d Cir. 1998).  Further, traditional showings of reliance and scienter are not required under GBL § 349.   See Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 178 F. Supp. 2d 198, 231 (E.D.N.Y. 2001) .

In the First Amended Complaint, Plaintiff HLB alleges that Plaintiff HLB provides families with certified caregivers for newborns in Texas, Florida, Virginia, Maryland and the District of Columbia.   Plaintiff HLB does not allege that Plaintiff HLB provides services to families in New York, or that unfair or deceptive conduct was directed to consumers in New York.  General Business Law § 349 is strictly limited in its territorial reach to purchases made in New York.   See Goshen v. Mutual Life Ins. Co. of N.Y., 98 N.Y.2d 314, 324-325 (N.Y. 2002).   Because Plaintiff HLB does not allege that Defendant Chapman's alleged misleading conduct was directed to consumers in New

26

Case No. 8:13-CV-2027-T-17AEP

York, Plaintiff HLB does not state a claim for relief pursuant to § 349.

After consideration, the Court denies Plaintiff's Motion for Default Judgment as to Plaintiff's claim for unfair trade practices under New York law.

6. Count VI - Theft of Property (Maryland Law)

Plaintiff HLB alleges that Defendant Chapman's actions in stealing Plaintiff's proprietary documents was tantamount to theft of property.

In the Amended Complaint, Plaintiff HLB alleges that: 1) on June 23, 2013, Defendant Chapman re-sent the contract to "Jane Doe" with Rensom's "Modern Newborn Solutions" logo; 2) on June 23, 2013, Plaintiff HLB terminated Defendant Chapman; 3) on June 24, 2013, Defendant Rensom emailed an updated contract for "Jane Doe" to sign; and 4) on June 24, 2013, Defendant Chapman admitted to Haleigh Almquist, member of Plaintiff HLB, that she deleted all of the emails from Plaintiff HLB's Google drive, and the files and emails included client information, client leads and historical business data. (Dkt. 23, p. 3).

Plaintiff HLB has not provided the "proprietary documents" at issue to the Court; the Court cannot evaluate the value of the proprietary documents themselves. It may be possible for Plaintiff HLB to establish that the "proprietary documents" meet the definition of "trade secret," and to provide evidence documenting the value of the proprietary documents and the resulting loss to Plaintiff HLB due to theft of those documents. Trade secrets are "assets and "property" of a corporation. See Bond v. Polycycle, Inc., 732 A.2d 970, 977 (Md. App. 1999)(an employee's taking of computer files containing trade secrets constituted a theft). The Maryland Uniform Trade Secrets Act defines a trade secret as:

27

Case No. 8:13-CV-2027-T-17AEP

> Information, including a formula, pattern, compilation,
> program, device, method, technique, or process, that: (1)
> derives independent economic value, actual or potential
> from not being generally known to, and not being readily
> ascertainable by proper means by, other persons who can
> obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

See Md. Com. Law II Code Ann. Sec. 11-1201(e).  Under the Maryland Uniform Trade
Secrets Act, there are two types of trade secrets: technological developments and
internal operating information.  Optic Graphics v. Agee, 591 A.2d 578 (Md. Ct. Spec.
App.), cert. denied, 598 A.2d 465 (1991).   Internal operating information relates to a
particular business organization.

    The Court notes that the "proprietary aspect" of a trade secret flows not from the
knowledge itself, but from its secrecy.  The Maryland Uniform Trade Secrets Act, Md.
Code Ann., Com. L. Art. Sec. 11-1201, et seq., defines a trade secret as information
that has value because it is not "generally known" nor "readily ascertainable."  Id.  at
Sec. 11-1201(e).   While the information forming the basis of a trade secret can be
transferred, as with personal property, its continuing secrecy provides the value, and
any general disclosure destroys the value.  One "owns" a trade secret when one knows
of it, as long as it remains a secret.  See Id., Sec. 11-1201(c).  One who possesses
non-disclosed knowledge may demand remedies as provided by the MUTSA against
those who "misappropriate" the knowledge.  A misappropriation occurs when one
acquires the secret information "by improper means" or discloses the secret information
acquired by "improper means."

    To the extent that Plaintiff HLB demonstrates that the "proprietary documents"
include trade secrets, Plaintiff may seek the amount of the actual loss caused by the
misappropriation, the unjust enrichment caused by the misappropriation that is not
taken into account in computing the actual loss, or a reasonable royalty for the

Case No. 8:13-CV-2027-T-17AEP

unauthorized disclosure or use of a trade secret. See Md. Com. Law Code Ann. Sec. 11-1203; Systems 4 v. Landis & Gyr, Inc., 1999 U.S. Dist. LEXIS 22657 (D. Md. Mar. 31, 1999).

After consideration, the Court grants Plaintiff HLB's Motion for Default Judgment as to Count VI as to liability, subject to the above qualification.   Accordingly, it is

**ORDERED** that Plaintiff's Renewed Motion for Default Judgment is **granted in part and denied in part**:

1. As to Count I, breach of fiduciary duty (Maryland law), the Motion for Default Judgment, based on the application of Texas law, is **granted** as to liability;

2. As to Count II, tortious interference with economic relations (Florida law), the Motion for Default Judgment is **granted** as to liability;

3. As to Count III, extortion (Florida law), the Motion for Default Judgment is **denied**, and Count III is dismissed with prejudice;

4. As to Count IV, defamation (Maryland law), the Motion for Default Judgment is **granted** as to liability;

5. As to Count V, unfair trade practices (Maryland law and New York law), the Motion for Default Judgment is **denied**, and Count V is dismissed with prejudice; and

6. As to Count VI, theft of property (Maryland law), the Motion for Default Judgment is **granted** as to liability, subject to the stated qualifications.

Case No. 8:13-CV-2027-T-17AEP

The Court **refers** determination of damages as to Count I, Count II, Count IV, and Count VI to the assigned Magistrate Judge to conduct a hearing, if necessary, and for a report and recommendation.  Counts III and V are **dismissed with prejudice**.

**DONE and ORDERED** in Chambers in Tampa, Florida on this _16th_ day of December, 2015.

ELIZABETH A. KOVACHEVICH
United States District Judge

Copies to:
All parties and counsel of record